UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

Case No. 05-60813 CIV-MOORE

MAGISTRATE JUDGE GARBER

FLORIDA ALLIANCE FOR RETIRED
AMERICANS, BROWARD ANTI-WAR
COALITION, BROWARD COUNTY GREEN
PARTY, GREEN PARTY OF FLORIDA,
HAITI SOLIDARITY, and LAKE WORTH
FOR GLOBAL JUSTICE,

    Plaintiffs,

v.

CITY OF FORT LAUDERDALE, a municipal
entity; and BROWARD COUNTY, a political
subdivision of the State of Florida,

    Defendants.

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR A
TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

## I. INTRODUCTION

Plaintiffs challenge several provisions of the Fort Lauderdale Municipal Code ("Code" or "Ft.L Code"), each regulating the use of traditional public fora for core expression, as well as a sweeping "security perimeter" established for the upcoming Organization of American States ("OAS") meetings in the City. These measures violate the First Amendment in several key respects. First, the challenged Code section regulating parades is an unlawful prior restraint as it requires permission from the police chief for any "parade" in the City, but contains no standards for obtaining permission. The Code also imposes a lengthy advance filing requirement for every "outdoor event," but 1) sets no time by which a decision to grant or deny the requested permit must be made, 2) no standards for making the decision, 3) no limits on required insurance or costs of security, and 4) conditions the issuance of a permit on the unqualified indemnification of the City by the permittee for any harm that may result during the event, even for acts of unauthorized third parties and deliberate violations of constitutional rights by City employees. In short, the Code is overbroad, vague, and lacks any standards and guidelines to check the unbridled discretion of City officials to use invidious content-based factors to decide who may "speak" in archetypal public fora. These laws are presumptively unconstitutional, as are all prior restraints, and fail the test of reasonable time, place or manner rules.

The City has also enacted an equally unconstitutional emergency ordinance specifically for the upcoming OAS meetings, imposing broad restrictions on all parades involving eight or more persons in a street, and all public assemblies involving eight or more people gathered to protest or demonstrate for a "common purpose" in any public place outside a structure for more than 30 minutes, with an explicit exception for "religious" processions and assemblies involving "well-established rites and practices" of a "bona fide religious sect" or organization. §26-202.1(a)(1) & (2).[1] Even if the City could, somehow, overcome the heightened scrutiny applied to ordinances regulating speech on the basis of content, and even if the City could establish a significant interest to support this provision, this ordinance would still fail because it is woefully under-inclusive as it bars possession of the enumerated items only for those who: 1) "parade" on a street, or 2) have a "common purpose" <u>and</u> assemble together in a public place outside a structure for longer than 30 minutes, <u>and</u> who "intend to attract attention" to their expressive activity. *Id.* Those who "parade" or "gather" in any number without a "common purpose," whether a busload of tourists or shoppers, with no message to communicate, are not reached by the ordinance and those who assemble with a "common purpose" to engage in a ritual

---

[1] The challenged emergency ordinance is Exhibit 10 to the Verified Complaint.

1

rite of faith are not subject to it.[2] Since Plaintiffs and others face the very real risk of prosecution if they violate these laws, their choice is to self-censor their First Amendment activities or risk criminal charges. This is an alternative the Constitution will not brook.

The pernicious nature of these sections is compounded by the Code sections regulating use of public sidewalks and streets corners. §§16-71, 72, 73 & 25-4.[3] These provisions criminalize even a single person standing on a public sidewalk if his or her presence "annoys" any passerby. Such a rule is vague at its core and has been condemned by the Supreme Court for nearly half a century because it serves as an invitation to the police to sweep the streets of disfavored and unpopular speakers.

Finally, the unreasonable "security perimeter" will keep anti-OAS protestors totally out of sight and sound of the delegates. It allows *ad hoc* decisions to convert archetypal public fora into "no protest" zones, keeping demonstrators a minimum of seven (7) football fields distance. An injunction should issue to enjoin enforcement of the challenged Code sections and the "security perimeter."

## II.   STATEMENT OF FACTS

The relevant factual information is set out in the Verified Complaint ("**VC**") and incorporated as though fully set forth herein.

### A.   The Parties

The Plaintiffs in this action are six community groups located in Florida, with members in Broward County. They are the Florida Alliance of Retired Americans ("**FLARA**"); the Broward Anti-War Coalition ("**BAWC**"); the Green Party of Florida and Broward Greens (collectively "**GREENS**"); Haiti Solidarity; and Lake Worth for Global Justice ("**LWGJ**"). Each of the Plaintiffs plans to engage in lawful expressive activities to communicate their views on issues of public concern to the **OAS** ministers gathering for the General Assembly meeting in Fort Lauderdale from June 4 to June 7. VC ¶¶4-9; 12.

The Defendants are the City of Fort Lauderdale and Broward County. The Broward Convention Center (the "**Center**"), the site of the **OAS** meetings, is located within property controlled

---

[2] To illustrate the absurdity of this law, it is illegal to possess a weapon in a group of eight or more people gathered outside a public structure for 30 minutes if the group has a "common purpose" for a protest, but if they are not there to "speak," or are there as part of a "religious" rite, the same number could stand in the same location all day long, armed to the teeth. While the City could ban all weapons in public places, it may not impose a ban as a prophylactic measure only against those who engage in otherwise lawful expression. *See Bourgeois v. Peters*, 387 F.3d 1303, 1312-1313 (11th Cir. 2004.)

[3] The exemption in Section 16-71(d) does not save the law as it must be read *in pari materia* with Sections 16-73 and 25-4 which are clearly impermissibly overbroad and vague. *See* Point D, *infra.*

2

by the County. The Plaintiffs plan to conduct a march and rally, as well as other events, in the City of Fort Lauderdale. VC ¶6.

### B. The Challenged Code Sections:

The City's Code regulates all "outdoor events," including parades and assemblies, and makes it a crime, *inter alia*, to "annoy" any person on a public sidewalk. VC ¶15(a)-(d). The City has also enacted an emergency ordinance, adding Code §26-202.1. VC ¶15(e). In pertinent part, this provision makes it unlawful to possess certain items - most of which are otherwise lawful to possess in public - if eight (8) or more persons assemble in a public place for more than 30 minutes for a "common purpose" with the intent to attract attention from the public. VC ¶15(e)(1)-(3).

A violation of these Code provisions is punishable pursuant to §1-06 by a fine of $500 to $1000.00, up to sixty (60) days in jail, or both. VC ¶¶15b(5) and 15e.

### C. The Security Perimeter

Defendants have announced that they intend to create a "security perimeter" around the site of the **OAS** meeting. There is already a 10-foot fence around the **Center**. Based on public statements of Defendants, Plaintiffs understand that the "security perimeter" will be more than one mile wide. VC ¶18. As presently configured, the "security perimeter" will create an unprecedented "no-protest" zone, keeping protestors so far away that they will not be visible or audible to the **OAS** delegates. VC ¶18-22.

## III. ARGUMENT

### A. Plaintiffs Have Standing to Challenge the Codes and "Security Perimeter"

Plaintiffs have standing to bring a facial challenge to the Code sections and the "security perimeter" on two bases. First, they have standing as entities subject to the requirements of the permit scheme. *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 755-56 (1988). Plaintiffs plan to engage in expressive activities covered by the Code to protest the policies of the OAS at the upcoming meetings on June 5, 2005. *See* Ex.1 [Declaration of Fransetta ¶¶ 2, 6-9, 12-14 (**FLARA**)]; Ex. 4 [Declaration of Sanders ¶5 (**BAWC**)]; Ex.6 [Declaration of Smithers ¶¶2, 11 (**AJA** and **BAWC**)]; Ex.7 [Declaration of Steiner ¶7 (**GREENS**)]; Ex. 8 [Declaration of Stevens ¶¶7-8 (**LWGJ**)]; Ex. 9 [Declaration of Thompson ¶6 (**HAITI SOLIDARITY**)]. Plaintiffs are also subject to exclusion from the "security perimeter" and will be precluded from communicating their message to their intended audience, the OAS ministers. Ex. 2 [Declaration of Keating ¶6]; Ex. 4 [Sanders ¶9].

Plaintiffs also have standing because of the risk of a chilling effect on the protected expression of others not before the Court. Under this well-established exception to Article III standing, challenges

3

may be made to "laws that are written so broadly that they may inhibit the constitutionally protected speech of third parties. [Citation.]" *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 798 (1984). "[T]he Supreme Court and this [Circuit] consistently have permitted facial challenges to prior restraints on speech without requiring the plaintiff to show that there are no conceivable set of facts where the application of the particular government regulation might or would be constitutional." *United States v. Frandsen*, 212 F.3d 1231 (11th Cir. 2000) (citations omitted). *Accord, Abramson v. Gonzalez*, 949 F.2d 1567, 1573 (11th Cir. 1992) (facial challenge proper as the rule "affects the enjoyment of freedoms which the Constitution guarantees and subjects the exercise of First Amendment freedoms to licensing requirements"). When free speech may be chilled, society's interest in reviewing an unconstitutional law offsets the usual concern of federal courts to avoid deciding constitutional questions if possible. As the Supreme Court observed in *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129-130 (1992):

> [I]n the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable. . . . This exception from general standing rules is based on an appreciation that the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court.

**B.  Standards for a Temporary Restraining Order/Preliminary Injunction**

A temporary restraining order is proper if the plaintiff establishes four elements: 1) a substantial likelihood of success on the merits; 2) the likelihood of irreparable injury unless the injunction issues; 3) the balance of harms tips in favor of the moving party; and, 4) if issued, the injunction would not be adverse to the public interest. *McDonald's Corp. v. Robertson*, 147 F.3d 1301 (11th Cir. 1998). The standards for a temporary restraining order are the same in the Eleventh Circuit. *Ingram v. Ault*, 50 F.3d 898, 900 (11th Cir. 1995). Plaintiffs readily meet each part of this test.

**C.  There Is a Substantial Likelihood That Plaintiffs Will Succeed on the Merits**

**1.  The City's permit scheme[4] is a content-based prior restraint that violates the First Amendment as an impermissibly vague and overbroad law**

"A prior restraint on expression exists when the government can deny access to a forum for expression before the expression occurs." *Frandsen*, 212 F.3d at 1236-37. In *Bourgois v. Peters*, 387 F.3d 1303, 1319 (11th Cir. 2004), the court held that a policy authorizing police officers to "prevent

---

[4] The reference to the "Permit Scheme" herein, unless otherwise stated, refers to Code Sections 15-181 to 184 & 26-202. The City's definition of an "outdoor event" applies to a "parade," and thefore, the provisions in Section 15-182 to 84 also apply to permits under Section 26-202.

4

people from assembling at the protest site and engaging in expression if they . . . possess certain otherwise legal items that have been prohibited from the protest area" was a prior restraint.

The City's permit scheme is a prior restraint as it requires a license for any parade in a street and any "outdoor event" of any size, including parades and assemblies, on all public property. §§15-181 to 184 & 26-202. "Although prior restraints are not *per se* unconstitutional, there is a strong presumption against their constitutionality." *Frandsen*, 212 F.3d at 1237, *citing FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225, (1990) (O'Connor, J.) (plurality opinion). This is so because a "[p]rior restraint upon speech suppresses the precise freedom which the First Amendment sought to protect against abridgment." *Carroll v. Pres. & Commissioners of Princess Anne*, 393 U.S. 175, 181 (1968).

The "twin evils" of a prior restraint are the potential for unfettered discretion and the absence of adequate procedural safeguards to protect against censorship by government officials. *FW/PBS*, 493 U.S. at 225. The City's laws suffer from both. As content-based laws,[5] they are subject to strict scrutiny and may be upheld only if they serve a **compelling** state interest and are the **least** restrictive burden on speech. *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983).

> a. **The ordinances lack adequate standards to check the unbridled discretion of officials in implementing this permit scheme**

It is black letter law that any attempt to subject "the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority is unconstitutional." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51 (1969). *See also Forsyth County*, 505 U.S. at 132. A law regulating speech in public fora fails if it "delegate[s] overly broad licensing discretion" to officials. *Id.* at 130. "A government regulation that allows arbitrary application is 'inherently inconsistent with a valid time, place and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'" *Id.* [citation omitted]. "To curtail that risk, a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority." *Forsyth County*, 505 U.S. at 130-31.

> Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech. Without these guideposts, post hoc rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine whether the licensor is permitting favorable, and suppressing unfavorable expression.

---

[5] *See* Point 2, *infra*, regarding the content-based nature of the challenged laws.

5

*City of Lakewood*, 486 U.S. at 758.[6] The City's Code lacks the narrow and specific guidelines needed to check official discretion. So, it is not "narrowly drawn" as the First Amendment demands. *Id.*

It matters not that the City may never have applied the Code in a content-based manner. A facial challenge to a permit scheme that "delegates overly broad discretion to the decision-maker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance preventing him from doing so." *Forsyth*, 505 U.S. at 133 and n. 10; *accord, City of Lakewood*, 486 U.S. at 757 ("mere existence of licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused"). "The First Amendment does not permit the government to place burdens on speech and assembly in . . . an unprincipled, *ad hoc* manner[,]" *Bourgeois*, 387 F.3d at 1318, and neither this Court nor the public can "depend on the individuals responsible for enforcing [a regulation] to do so in a manner that cures [the law] of constitutional infirmities[.]" *Frandsen*, 212 F.3d at 1240.

### 1. The lack of time standards for deciding a permit

Fort Lauderdale Code §26-202 requires "permission issued by the police chief" for any "procession or parade," but contains absolutely no time for filing or time by which a permit would be decided. Applicants for an "outdoor event" of any type, including parades, must submit their applications at least 90 days in advance if more than 500 people are expected, and at least 30 days in advance if 500 or less are anticipated. §§ 15-181(a), 182(a) & 184(b). The city manager has full discretion to decide whether to impose a late fee on an application filed less than 90 days in advance. §15-182(a). The Code contains no set time by which such decisions must be made. §§15-182, 184(b) & 26-202.

For nearly four decades, the United States Supreme Court has condemned similar laws imposing lengthy advance filing requirements. "[T]iming is of the essence in politics . . . and when an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all." *Shuttlesworth*, 394 U.S. at 163. Here, City officials are unconstrained by any textual limits in the Code from holding a permit request until the last moment, only then to deny it for unspecified reasons, leaving no opportunity to seek prompt judicial review of the denial of a permit.

In *Frandsen*, the court invalidated a law requiring officials to issue a permit "without

---

[6] Even content-neutral time, place and manner rules require adequate standards to guide the decisionmaker's determination. *Thomas v. Chicago Park District*, 534 U.S. 316, 323 (2002).

6

unreasonable delay," but that lacked standards to give the government, "the public, or any reviewing court, . . . any guidance as to what is considered 'unreasonable.'" 212 F.3d at 1240. As in *Frandsen*, Fort Lauderdale's Code "fails to put any real time limits on the [decision maker]." *Id.* The failure of the regulation in *Frandsen* "'to confine the time within which the licensor must make a decision[,]' . . . , made it an unconstitutional law that 'risks the suppression of protected expression for an indefinite time period prior to any action.'" *Frandsen*, 212 F.3d at 124 (citation omitted). On this basis, alone, the entire Fort Lauderdale permit scheme fails.

### 2. The lack of standards for granting a permit

The fatal lack of a time by which to decide a permit application is compounded here because the Code is devoid of standards on other key provisions. Section 26-202 requires permission of the police chief to "parade," but does not state how permission is obtained. Similarly, there are no standards provided for denying or granting a permit for an "outdoor activity." §15-181 &182(b); *see* Point 3(b), *infra*. Public officials are vested with uncabined authority to impose conditons on a permit. *Id.* The Code defines an "outdoor event" broadly to include a gathering of any size in all public fora if the group uses any type of temporary structure, including even small tents as an expressive element,[7] or a small temporary stage for speakers. §15-181(a). The Code does not define what constitutes a "temporary structure," invoking the most burdensome economic conditions. *Id.*; §15-182(a) & (b). Indeed, the law is so broadly written that the iconic Hype Park speaker could not stand on a soapbox and exhort listeners without first complying with all Code requirements of a "minor outdoor activity," including a 30-day advance filing notice.

Permittees must provide a minimum of $1,000,000 in liability insurance for an "outdoor activity," with no exception for indigent applicants, and with total discretion vested in the risk manager to set a greater amount. §§15-182(c) & 183(b)(7). As but one more example of the fatal lack of standards, the Code imposes the costs of police protection for any "outdoor event" on the permittee at the total discretion of police officials to set the cost and to make the determination on any factor, including unlawful ones such as the response of hostile onlookers. §15-183(b)(5).

"Excessive discretion over permitting decisions is constitutionally suspect because it creates the opportunity for undetectable censorship and signals a lack of narrow tailoring." *Burk v. Augusta Richmond County*, 365 F.3d 1247, 1256 (11th Cir. 2004). Because the City's Code embodies

---

[7] *See Community for Creative Non-Violence v. Clark*, 468 U.S. 288 (1984) (use of tents protected as expressive element).

7

"[e]xcessive discretion over permitting decision," it fails this rule.

### b. The City's Code lacks sufficient procedural safeguards

In addition to the requirement of adequate standards to fetter the discretion of those charged with enforcing a licensing scheme impacting expression, a prior restraint must contain basic procedural safeguards to ensure that protected expression is not inhibited. At a minimum, it must allow for prompt judicial review in the event the permit is denied or unduly burdened. *Freedman v. Maryland*, 380 U.S. 51, 58-59 (1965).[8] *See also Forsyth County,* 505 U.S. 123. "Meaningful judicial review is the touchstone of the [prior restraint] test. 'Prompt judicial review must be available to correct erroneous denials' of access to expression.'" *Bourgeois*, 387 F.3d at 1319-20. Because it lacks any time for deciding a permit application, the City's Code misses the mark completely. *See Redner v. Dean*, 29 F.3d 1495, 1502 (11th Cir. 1994) ("ordinance . . . inadequate under any interpretation of 'prompt judicial review' because it creates the risk that expressive activity could be suppressed indefinitely prior to any judicial review of the decision to deny a license").

### c. No compelling interest can justify such unbridled discretion

The Eleventh Circuit recently held that an "asserted government interest ... in 'maintaining public safety, security and order' for the protection of participants, law enforcement, and innocent bystanders" was not sufficient to overcome a standardless policy to search all protesters at the School of the Americas. *Bourgeois*, 387 F.3d at 1321. As noted in *Bourgeois*, the Supreme Court long ago held that a governmental interest in promoting "'public welfare, peace, safety, health, decency, good order, morals or convenience' is too amorphous meaningfully to cabin [otherwise unbridled] discretion." *Id.* at 1319. There is no interest the City can advance here to justify unbridled discretion.

## 2. The Code is Not a Reasonable Time, Place or Manner Regulation

The City regulates core expressive activity in virtually all public fora. "In such places, which occupy a 'special position in terms of First Amendment protection,' *United States v. Grace*, 461 U.S. 171, 180 (1983), the government's ability to restrict expressive activity 'is very limited.' *Id.* at 177." *Boos v. Barry*, 485 U.S. 312, 318 (1988). The government may regulate the time, place, and manner

---

[8] In contrast to the content-neutral law in *Thomas*, 534 U.S. at 318, applicable to any group of 50 people or more, and only in public parks, the City's Code expressly targets core speech (parades and public assemblies) in all public fora. The Chicago ordinance also contained explicit checks on discretion, requiring decisions on permits within 14 days, limiting grounds for denial and requiring a written explanation, as well as a prompt appeal process. *Id.* Each factor that saved the law in *Thomas* is missing here.

8

of expression in public fora so long as the restrictions "are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Grace,* 461 U.S. at 177 (internal quotation marks and citations omitted). *Accord, Forsyth County,* 505 at 130 (same). The failure to meet any prong is fatal to the entire law. *Perry,* 460 U.S. at 45. The City's scheme violates all three prongs.

### a.  Fort Lauderdale Code Sections 15-181 through 15-184 and 26-202 are not content-neutral regulations

To pass constitutional muster, a time, place or manner regulation of speech in a traditional public forum must be "justified without reference to the content of the regulated speech, . . . narrowly tailored to serve a significant governmental interest, and [must] ... leave open ample alternative channels for communication[.]" *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293, (1984). If the decision involves the "appraisal of facts, the exercise of judgment, and the formation of an opinion," it is content-based and the "the danger of censorship and of abridgment of our precious First Amendment freedoms is too great to be permitted." *Forsyth,* 505 U.S. at 131 [internal citations omitted]. The City's Code contains **no** standards for deciding permits. Officials may decide based on the content of the speech and, for disfavored speakers, delay or deny the permit, or impose onerous conditions. For this reason, Sections 15-181 through 15-184 and 26-202 are not content-neutral.

### b.  The recently enacted emergency ordinance is not content-neutral

Defendant's emergency ordinance regulating Parades and Public Assemblies, Code Section 26-202.1, is not content-neutral for several reasons. First, the definitions of a "Public Assembly" turns upon whether as few as eight people, assembled in a public place outside a structure for more than 30 minutes, are gathered for a "common purpose . . . with the intent of attracting public attention," §26-202.1(a)(2), and the term "parade" turns on whether there is a "coordinated movement ... of 8 or more pedestrians or vehicles upon the streets... with an intent of attracting public attention[.]" §26-202.1(a)(1).[9] Assessing whether the group shares a "common purpose" and has the "intent of attracting public attention" requires a content-based examination of the group's message.

Section 26-202.1 is also content-based for the same reason that the magnetometer searches were in *Bourgeois*. "[W]hen a government official decides that certain expressive activity will lead others to break the law, he is making a content-based distinction." 387 F.3d at 1320. The exemption

---

[9] The same religious exemption and "intent to attract attention" apply to a "Parade." For the same reasons that the "Public Assembly" provision fails, the limit on "Parades" is unconstitutional.

9

for a "gathering directly associated with a practice or rite of a well-recognized bona fide religious sect or organization" is the third reason this law is content-based.[10] The preference for religious speech requires officials to examine speech to decide: 1) if it is part of a religious practice or rite and 2) whether the religious group is a "well-recognized bona fide religious sect or organization."

Religious adherents, shoppers, tourists, construction workers and others are not subject to this law, while even small groups in the same site for a "common purpose" to engage in expressive activity with the "intent to attract attention" would risk arrest. "The ordinance thus bans purposeful speech and permits incidental speech. [¶] This reasoning turns the First Amendment on its head. It is well-established that the First Amendment affords the greatest protection to purposeful speech while allowing more regulation of incidental speech. Government can assert no substantial interest in suppressing speech when the speaker intends to communicate but permitting the same speech if incidental to another activity." *Foti v. City of Menlo Park*, 146 F.3d 629, 639 (9th Cir. 1998).

The City's emergency ordinance has singled out some persons and chosen to regulate their activity not simply because they chose to engage in expression in the first place, but because of their viewpoint. *See Burk*, 365 F.3d at 1251 & n.6.[11] This is the hallmark of an impermissible content-based law. As in *Burk*, Defendant's ordinance "is not justified by its purported content-independent goals, and . . . [the City] has regulated based on content." *Burk*, 365 F.3d at 1253.

3. **Even assuming content-neutrality, the permit scheme is not narrowly tailored and does not allow for ample alternatives for communication**

a. **The City's burden to prove narrow-tailoring**

"The requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a

---

[10] The equal protection problems created by this ordinance are also fatal. What compelling interest could the City advance to justify distinguishing between "well-recognized" and less well-recognized religious sects without violating the Constitution? *See e.g., Larson v. Valente*, 456 U.S. 228 (1982) (state may not discriminate among religions in allocating benefits or burdens); *United States v. Ballard*, 322 U.S. 78, 86-87 (1994) ("First Amendment does not select any one group or any one type of religion for preferred treatment). FtL Code Sections 15-184(a) & (b) exempt "schools, churches . . . and other charitable or nonprofit organizations" from significant strictures of the "outdoor event" requirements, including the insurance, indemnification and "hold harmless" demands, with city commission approval, but provides no standards for securing the exemption. So, with commission approval, a battered women's shelter with non-profit status would not have to pay costs and sign in advance to indemnify and hold the City harmless, but battered women, acting alone, would have to pay. No governmental interest can rationalize this distinction.

[11] Unlike the law in *Burk*, governing all "protests" and "demonstrations" as a class, the City only regulates expression if protestors share a "common purpose," or are engaged in a "coordinated movement" and if they are not part of a well-established "religious" rite or practice, all requiring review of the viewpoint and content of speech as a threshold question to see if the law applies.

substantial government interest that would be achieved less effectively absent the regulation." *Ward, supra*, 491 U.S. at 799 (citation omitted). "This means the regulation need not be a perfect fit for the government's needs, but cannot burden substantially more speech than necessary." *Id.* at 800.

While "[t]he State . . . has a strong interest in ensuring the public safety and order, in promoting the free flow of traffic on public streets and sidewalks . . . ," at the same time, when First Amendment rights are at issue, the government has the burden of showing that the law is narrowly tailored and that there is evidence supporting its proffered justification. In this regard, it is important to underscore that "[courts] have never accepted mere conjecture as adequate to carry a First Amendment burden." *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 392 (2000). *See also Turner Broadcast System, Inc. v. F.C.C.*, 512 U.S. 622, 644 (1994) ("When the government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease to be cured."). To prove narrowly tailoring, the City must show **actual**, not speculative harm, and that the disputed laws actually address that harm. *Id.*

        **b.**      **The permit scheme lacks standards essential for narrow tailoring**

              **1.**      **The lack of standards to decide whether to issue a permit**

Even a content-neutral law is not narrowly-tailored "[w]here the licensing official enjoys unduly broad discretion . . . to grant or deny a permit, [as] there is a risk that he will favor or disfavor speech based on its content." *Thomas*, 534 U.S. at 323, *citing Forsyth County*, 505 U.S. at 131. "A government regulation that allows arbitrary application is 'inherently inconsistent with a valid time, place and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'" *Forsyth County*, 505 U.S. at 132 (citation omitted).

The Supreme Court "requires that a time, place and manner regulation contain adequate standards to guide the official's decision and render it subject to effective judicial review." 534 U.S. at 323, *citing Niemotko v. Maryland*, 340 U.S. 268 (1951). The ordinance in *Thomas* included express bounds on the bases for denying a permit, required officials to process applications within 28 days and explain in writing any denials. *Thomas*, 534 U.S. at 32. These were held to be sufficiently specific and objective to insulate against the exercise of the "whim of the administrator." *Id.*, *citing Forsyth County*, 505 U.S. at 133. "They provide 'narrowly drawn, reasonable and definite standards' to guide the licensor's determination. . . . And they are enforceable on review – first by appeal to the General Superintendent of the Park District, . . . and then by writ of common-law certiorari in the Illinois courts[.]" 534 U.S. at 32. Defendant's Code lacks standards and any chance for review.

11

Bereft of the safeguards present in *Thomas,* the City's permit scheme is unconstitutional. *See also City of Lakewood,* 486 U.S. at 769-70 (discretion impermissibly unfettered where official may impose "such other terms and conditions deemed necessary"); *Shuttlesworth,* 394 U.S. at 156-58 (unbridled discretion in regulation permitting decisions to grant or deny a parade permit to be made on "the public welfare, peace, safety, health . . ."). Defendant's Code sets no time by which a permit request must be decided, enumerates no bases for granting or denying a request, and contains no standards for setting conditions on a permit. Such "[e]xcessive discretion over permitting decisions is constitutionally suspect because it creates the opportunity for undetectable censorship and **signals a lack of narrow tailoring**." *Burk,* 365 F. 3d at 1256 (emphasis added).

### 2. The lack of standards for insurance and security costs

The City's Code lacks adequate standards in other key respects. A minimum $1,000,000 liability policy is necessary for any "outdoor event." The city manager may increase the insurance required to any level on any basis, and the police chief has total discretion to decide security costs, a potentially crippling financial burden on expressive activity. §§15-181, 182, 184 & 15-183(7) & 26-202.

In *Forsyth County,* the Supreme Court invalidated laws vesting unbridled discretion in the administrator to set insurance levels and "assess a fee to cover 'the cost of necessary and reasonable protection of persons participating in or observing said . . . activit[y]'." 505 U.S. at 134. The failure to set guidelines for the application of law rendered it "unconstitutionally content-based," *id.* at 136, and allowed "censorship through uncontrolled discretion." *Id.* at 133.

Even before *Forsyth County*, this Circuit condemned similar laws vesting public officials with unfettered discretion to impose a financial burden on core expressive activity in public fora without the necessary standards to check the invitation to engage in invidious content-based determination. In *Central Florida Nuclear Freeze Campaign,* 774 F.2d 1515, 1517 (11th Cir. 1985), the Circuit struck down a law that authorized the City of Orlando to charge for additional police protection "as a condition of the issuance of the permit." Orlando had assessed approximately $1,500 for police services at plaintiff's rally based on consideration, *inter alia,* of "the controversial nature of the rally and the location of the Martin Marietta plan," as well as the "potential for hostile counter activity" and the involvement of many "non-local participants who, based on past police experience, the City concluded would be more likely to cause disorder than would local residents." *Id.* Although the Court found that these factors could be weighed in deciding the City's own plans for responding to the demonstration, the costs of protection could not be passed on to the permittees. *Id.* at 1524. The

Circuit struck down the law as it vested unbridled discretion to impose "unlimited charges for the costs of additional police protection based on the content of the speaker's views" under the guise of a time, place and manner regulation of parades and assemblies. *Id.* at 1523.

Significantly, the Eleventh Circuit also emphasized such costs may be a complete barrier to speech. "[I]ndigent persons who wish to exercise their First Amendment rights of speech and assembly and as a consequence of the added costs of police protection, are unable to pay such costs, are denied an equal opportunity to be heard." *Id.* at 1523. The same is true here as there is no exception to the requirement to pay for insurance and additional security charges before a permit may issue. §15-182(b) & (c), 15-183(b)(6) & (7).[12] As in *Forsyth County* and *Central Florida*, Fort Lauderdale's ordinance vests unfettered discretion in public officials to determine the costs of core expression based on content and other impermissible considerations, including the likelihood of hostile onlookers.

    c.    **The emergency ordinance is not narrowly tailored**

For the same reasons that Section 26-202.1 is not content-neutral, the City's emergency ordinance fails the requirement to be narrowly tailored. "Simply identifying a manner of speech that legitimately may be restricted is not the end of the matter[.]" *Bourgeois*, 387 F.3d at 1323. Even if the government could assert some arguably legitimate basis for this regulation, the sweeping exemption for "well-established religious rites or practices" linked to "bona fide religious sects" or organizations, as well as the exemptions for those who assemble but share no "common purpose," or do not "intend to attract attention" by their presence undermine the claim that this law is narrowly-tailored. No standards or guidelines exist for public officials to decide any of these elements.[13]

Moreover, such "exemptions from an otherwise legitimate regulation of a medium of speech may be noteworthy for a reason quite apart from the risks of viewpoint and content discrimination: they may diminish the credibility of the government's rationale for restricting speech in the first place." *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994). That is so where, as here, those who do not share a "common purpose" or "intend to attract attention" may carry baseball bats many times larger and more

---

[12] *See also Transportation Alternatives, Inc. v. City of New York*, 340 F. 3d 72 (2nd Cir. 2003) (special events law unconstitutional based on overly broad discretion by the Commissioner to set charges).

[13] Is a Supreme Court decision required to prove that a rite or practice is well established, or that the "sect" is bona fide? *See e.g., Church Of The Lukumi Babalu Aye, Inc. v. City Of Hialeah*, 508 U.S. 520 (1993) (striking law criminalizing animal sacrifice, a devotional rite of Santeria adherents).

13

forceful than the regulated sticks for a sign. Those without a "common purpose" may, without violating the law, also possess large religious symbols, bicycle locks with chains, glass bottles, Swiss Army knives, umbrellas and other inherently lawful items regulated by this ordinance. If officials determine the exception applies, practitioners of "bona-fide religious sects or organizations" may carry otherwise banned items to perform animal sacrifice rituals; large wooden prayer alters of any material far thicker than the 1/4" allowed for protest signs; or replicate the Stations of the Cross at Easter by carrying large wooden crosses far thicker than the size of sticks allowed for protest signs.

Even the recitation of alleged past incidents of violence at some unidentified demonstrations elsewhere does not legitimize this as a narrowly-tailored ordinance. Ex. 10. *Bourgeois*, 387 F.3d 1303, (voiding magnetometer search requirement as an unreasonable condition of entering protest area outside Fort Benning School of the Americas despite assertions of threat of violence). Section 26-202.1 operates exactly like the magnetometer search invalidated in *Bourgeois,* and, for the same reasons, it is not narrowly-tailored.

### d. The permit scheme fails to leave open ample alternatives for communication

It is a cardinal rule of First Amendment law that "[the] streets [and sidewalks] are natural and proper places for the dissemination of information and opinion; and one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Thornhill*, 310 U.S. at 105-106 [citations omitted]. The City's Code does not allow for ample alternatives for core expression within the City. If a permit for an outdoor rally is not submitted at least 30 to 90 days in advance, depending upon the number of people who will assemble, if insurance is not posted and indemnification not agreed to, the group is, effectively, foreclosed from all public fora in the City. Even the sidewalks are unavailable to Plaintiffs if anyone, including a police officer, objects to their expressive activity as "annoying." §§16-71(8), 16-73 & 25-4.

### 4. The indemnification and hold-harmless provisions are unlawful

Fort Lauderdale conditions a permit for any "outdoor activity" on the agreement to indemnify the City and assume all risk for anything that might happen in conjunction with the permitted event, including for acts of unauthorized third persons, counterdemonstrators, and deliberate wrongful acts of the government. §15-183(7). The right to speak is conditioned on an applicant's agreement to be liable not only for its own potential lawless acts, but that of others the permittee does not control.

The exercise of free speech may not be conditioned on the agreement to defend the government. This is why similar provisions have been struck down in the political demonstration

14

context. *See e.g., Eastern Connecticut Citizens Action Group v. Powers*, 723 F.3d 1050, 1057 (2nd Cir. 1983); *Mardi Gras of San Luis Obispo v. City of San Luis Obispo*, 189 F. Supp. 2d 1018, 1030 (C.D. Cal. 2002); *Pinette v. Capitol Square Review Comm*, 874 F.Supp. 791, 792 (E.D. Ohio 1994). The requirement to indemnify and hold harmless also allows the City to avoid risk for its own constitutional violations done pursuant to an official policy, practice or custom, for which they should not be indemnified. *See Monell v. Department of Social Services*, 436 U.S. 658 (1978).

Moreover, the First Amendment does not allow tort liability to be imposed for expressive activities based solely on the role of organizer of a protest, picket, parade or other constitutionally protected expressive activity. In *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1983), the Supreme Court rejected attempts by Mississippi to impose liability on a civil rights organization and its leaders for unauthorized criminal acts and violence committed by some participants in a demonstration. The Court held that liability for damages caused by individuals may stand only if the tortfeasors were "agents," operating within the scope of their actual or apparent authority," or the conduct occurred with the organization's "knowledge" and it was "specifically ratified." *Id.* at 930.

Accordingly, the City may not condition a permit on the unconstitutional requirement to assume liability the permittee could not incur under the First Amendment. Faced with such a prospect, some people may simply decide to forego their rights to demonstrate rather than assume this enormous financial risk. "[T]he very purpose of the unconstitutional conditions doctrine is to prevent the Government from subtly pressuring citizens, whether purposely or inadvertently, into surrendering their rights." *Bourgeois*, 387 F.3d at 1324-25. "The applicability of the unconstitutional conditions doctrine does not turn on whether conferral of the discretionary benefit is conditioned upon completely foregoing the right to engage in expression or instead upon foregoing the right to engage in that expression in certain places or manners or at certain times." *Id.*, at 1325, *quoting Sammy's, Ltd. v. City of Mobile*, 140 F.3d 993, 1000 n.2 (11th Cir. 1998).

D.  **The Criminalization of Mere Presence on a Sidewalk Based on "Annoyance" or "Obstruction" Renders the Code Impermissibly Vague and Overbroad as It Restricts Protected Expressive Activity in Quintessential Public Fora**

Sections of the Code make it unlawful to be on a public sidewalk "to the annoyance or hindrance to the passerby," (Section 16-73), or if "...conduct hinders, molests or annoys persons passing along a street, sidewalk crosswalk or other public way" (Section 16-71(8)), or for a "person to so use or obstruct...public sidewalks as to interfere with the use of the public..." (Section 25-4). All of these restrictions are impermissible under the First Amendment.

Peaceful protest on public sidewalks is a quintessential First Amendment activity. *See e.g.*,

15

*Perry*, 460 U.S. at 45; *Gregory v. City of Chicago*, 394 U.S. 111, 112 (1969); *Edwards*, 372 U.S. at 235 (reversing "breach of peace" convictions for civil rights protestors). The City may not "make criminal the peaceful expresion of unpopular views. . . . 'unless shown likely to produce a clear and present danger of a serious substantive evil that rises **far above public inconvenience, annoyance, or unrest.**'" *Terminiello v. Chicago*, 347 U.S. 1, 4-5 (1949).

Since *Coates v. Cincinnati*, 402 U.S. 611 (1971), it has been abundantly clear that the government may not criminalize activity on a sidewalk on the inherently vague basis that the conduct is "annoying" to someone else, whether the police or a passerby. The "ordinance is unconstitutionally vague because it subjects the exercise of the right of assembly to an unascertainable standard, and unconstitutionally broad because it authorizes the punishment of constitutionally protected conduct." *Id.* at 614. "Conduct that annoys some people does not annoy others. Thus, the ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible standard, but rather in the sense that no standard of conduct is specified at all." *Id.*

The ability to restrict assemblies on sidewalks based on any "obstruction" is similarly unlawful. In *Cox v Louisiana,* 379 U.S. 536 (1965), the Supreme Court overturned the convictions of civil rights activists. Two thousand students assembled peaceably at the state capitol building and marched to the courthouse, where fellow activists arrested earlier were being held. With official permission, but without a permit, they assembled on the sidewalk across the street from the courthouse and, in a lawful manner, rallied and marched. When they failed to disperse pursuant to a police order that they had exceeded their time for demonstrating, they were arrested for obstructing a sidewalk.

The Supreme Court held that the Louisiana statute was unconstitutionally broad and would allow punishment for peacefully protest involving disfavored views. The Court also held that the conviction under a statute banning obstruction of public sidewalks was a clear violation of freedom of speech and assembly where the "obstruction" ordinance was coupled, as here, with the unfettered discretion of local officials to regulate the use of streets for peaceful parades and assemblies. *Cox*, *Edwards*, and *Gregory* require that Sections 16-71, 16-73 and 25-4 be invalidated.

E.   **The "Security Perimeter" is Not a Reasonable Time, Place or Manner Rule**

The recently announced "security perimeter" creates an unprecedented "no-protest" zone around the Port and compels Plaintiffs to convey their messages from a distance greater than three football fields, at the closest point. Ex.2. Plaintiffs cannot be seen or heard at all by those attending

*Consciousness, Inc. v. Lee*, 505 U.S. 672, 696 (1992) (Kennedy, J., concurring). In *Boos v. Barry*, the Supreme Court considered the "congregation clause" in the District of Columbia that made it unlawful "[t]o congregate within 500 feet of any [embassy, legation, or consulate] and refuse to disperse after having been ordered so to do by the police." 485 U.S. 312, 316 (1988). By comparison, the OAS "no-protest" zone is nearly two and one-half times this distance at its closest point. Ex. 2.

This Circuit has rejected the argument that September 11, 2001 somehow exempted the government from settled constitutional rules when large protests are anticipated near "sensitive" locations. Wholly speculative fear of violence may not substitute for the proof of likely harm required to impose limits on core constitutional rights. *See Bourgeois*, 387 F.3d at 1311 ("This argument is troubling. While the threat of terrorism is omnipresent, we cannot use it as the basis for restricting the scope of the *Fourth Amendment's* protections in any large gathering of people. In the absence of some reason to believe that international terrorists would target or infiltrate this protest, there is no basis for using September 11 as an excuse for searching the protestors."). The government may not foreclose substantial expressive activity in public fora on "mere speculation of danger[,]" even when premised upon "the existence of terrorism in the world generally . . . or other threats of violent attacks . . . unrelated to incidents in the [area of the intended protest]." *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1227-28 (9th Cir. 1990) (rejecting 75-yard security zone to "protect . . . public and navy officials from attack"). As in *Bourgeois* and *Bay Area Peace Navy*, there is no justification for keeping protestors against the OAS so far from a reasonable opportunity to reach their target audience.

Long standing precedent requires that government impediment of core expressive activity must be based on a "clear and present danger of imminent violence," which requires more than a showing that "previous violence" occurred elsewhere. Enjoining or preventing First Amendment activities before demonstrators have acted illegally or before the demonstration poses a clear and present danger is presumptively a First Amendment violation." *Carroll v. President and Commissioners of Princess Anne*, 393 U.S. 175, 180-81. *See also, Brandenburg v. Ohio*, 395 U.S. 444 (1969); *Sabel v. Stynchcombe*, 746 F.2d 728, 730-31 (11th Cir. 1984) ("record casts doubt on conclusion that police had a sufficient interest in preventing imminent violence to justify restricting appellants' speech").

### G. The Other Bases For The Granting Of Injunctive Relief Are Met

#### 1. The Plaintiffs will suffer irreparable injury

The irreparable injury to Plaintiffs is clear. So long as the City's ordinances and the sweeping "security perimeter" are in effect, and so long as the City has unbridled discretion to implement the Code provisions, including to decide whether or not to issue a permit for protected expressive activity,

Plaintiffs suffer the threat of imminent denial of their First Amendment rights to free expression and assembly. If the City is not enjoined from applying its newly enacted law imposing sweeping conditions on even very small public assemblies of more than 30 minutes, Plaintiffs lose the ability to exercise their First Amendment rights in a meaningful manner. Thus, Plaintiffs are forced to choose between exercising the constitutional right of speech and assembly and avoiding criminal prosecution. "The loss of First Amendment freedoms, for even minimal periods of time unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). *See also* 11 Wright & Miller, *Federal Practice & Procedure*, § 2948, at 440 (1973) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

### 2. The balance of hardships favors plaintiffs

The balance of hardships weighs heavily in Plaintiffs' favor. In contrast to the harm Plaintiffs will suffer if a restraining order is not granted, Defendants will not suffer any injury if they are prevented from enforcing unlawful restrictions on the exercise of First Amendment rights and required to provide Plaintiffs proximity to the OAS audience. Defendants are still free to enforce the general criminal laws such as disorderly conduct, blocking vehicular traffic, etc., if Plaintiffs' **conduct** goes beyond the bounds of the First Amendment.

### 3.   Granting plaintiffs' motion is in the public interest

A temporary restraining is in the public interest here. "[T]he public interest is always served when constitutional rights, especially free speech rights, are vindicated." *University Books & Videos, Inc. v. Metropolitan Dade County*, 33 F. Supp.2d 1364, 1374 (S.D. Fla. 1999); *Wyner v. Struhs*, 254 F.Supp.2d 1297 (S.D. Fla. 2003) (granting preliminary injunction for expressive activity in state park).

### 4.   The Court should waive the bond

Plaintiffs request that they not be required to post any bond. The court has the discretion to grant this request. *Campos v. INS*, 70 F.Supp.2d 1296, 1310 (S.D. Fla. 1998). Public interest litigation is a recognized exception to the Rule 65 security requirement. *See e.g., City of Atlanta v. Metro Atlanta Rapid Transit*, 636 F.2d 1084, 1094 (5th Cir. 1981). Waiver of a bond is proper where plaintiffs seek to vindicate federal statutory or constitutional rights. *Campos*, 70 F.Supp.2d at 1310; *McCormack v. Township of Clinton*, 872 F.Supp. 1320, 1328 (D.N.J. 1994) (vindication of political speech is of tremendous public significance justifying waiver of bond). Waiver is also proper since, as demonstrated above, Plaintiffs have shown a high probability of success on the merits and there is little likelihood, if any, of any significant cost or monetary harm to defendants from the issuance of the Temporary Restraining Order. *University Books,* 33 F.Supp.2d at 1374. Further, requiring a bond

in this instance would cause a significant hardship on Plaintiffs. *McCormack*, 872 F.Supp at 1328 (court should weigh the potential loss to the enjoined party against the hardship that a bond would impose on the applicant); *University Books*, 33 F.Supp.2d at 1374. The balance of hardships, and other factors, tip sharply in the Plaintiffs' favor. The Court should not require them to give security.

## IV. CONCLUSION

For all of the foregoing reasons, Plaintiffs request that a temporary restraining order issue to enjoin enforcement of Fort Lauderdale Code Sections 15-181 through 15-184, 16-71(8), 16-73, 25-4, 26-202 and 26-202.1 and to enjoin exclusion of Plaintiffs from the "security perimeter."

DATED: May 19, 2005

Respectfully Submitted,

_____
ROBERT W. ROSS, JR., FBN 921660

Randall Marshall FBN 0181765
American Civil Liberties Union Foundation
  of Florida, Inc.
4500 Biscayne Boulevard
Miami, FLorida 33137
T. 305 576-2337; F. 305 576-1106
rmarshall@aclufl.org

Robert W. Ross, Jr., FBN 921660
LAW OFFICES OF ROBERT W. ROSS, JR., P.A.
728 Belvedere Road, Suite 2
West Palm Beach, FL 33405
T. 561-241-2790; F. 561-241-2790 T. 561-251-4896
bravelaw@mindspring.com

Andrea Costello, FBN 532991
Alice K. Nelson, FBN 211771
SOUTHERN LEGAL COUNSEL, INC
1229 N.W. 12th Avenue
Gainesville, Florida 32601
T. 352-271-8890; F. 352-271-8347
andrea.costello@southernlegal.org
alice.nelson@southernlegal.org

Mara Shlackman, FBN 988618
LAW OFFICES OF MARA SHLACKMAN, P.L.
PMB 309
757 Southeast 17th Street
Fort Lauderdale, FL 33316
T. 954-523-1131; F. 954-523-1250
mara@shlackmanlaw.com

Zeina N. Salam, FBN 653632
1260 E. Oakland Park, Suite 200
Fort Lauderdale, FL 33334
T. 954-736-2140; F. 954-453-3035
zns_law@yahoo.com
Cooperating Attorney, American Civil Liberties Union Foundation of Florida, Inc. - Broward Chapter

Carol A. Sobel (Pro Hac Vice)
LAW OFFICE OF CAROL A. SOBEL
429 Santa Monica Boulevard, Suite 550
Santa Monica, California 90401
T. 310-393-3055; F. 310-393-3605
carolsobel@aol.com